UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **PAUL VON NESSI**, *et al.*, | Civil Action No. 07-2820 (PGS) |
| Plaintiffs, | |
| v. | OPINION |
| **XM SATELLITE RADIO HOLDINGS, INC.**, *et al.*, | |
| Defendants. | |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on Defendants', XM Satellite Radio Holdings, Inc. and XM Satellite Radio, Inc. ("XM"), motion to dismiss Plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) and Plaintiffs' motion for leave to file a second amended class action complaint under Federal Rule 15(a). On September 2, 2008, the Court converted Plaintiffs' motion into a motion for summary judgment and gave the parties two weeks to submit additional briefs.

XM experienced an interruption of service[1] for a 24-hour period on May 21-22, 2007. XM has two satellites which orbit over the United States and from which radio signals are received and then beamed back to subscribers. Plaintiffs describes the system as:

---

[1] By way of observation, there are few class actions for service disruptions or outages filed against utilities. Generally, such disruptions require a showing of negligence and that the consequential damages are specific to the individual suing. *See Liability of Electric Power of Light Company to Patron for Interruption, Failure, or Inadequacy of Power*, 4 A.L.R. 3d 594 (1965, updated 2008). *Cf. Muise v. GPU, Inc.*, 851 A.2d 799 (N.J. App. Div. 2004), *appeal after remand*, 917 A.2d 261 (N.J. App. Div. 2007).

> a network consisting of high-power satellites and uplink facility and ground-based repeaters primarily in dense urban areas to provide coverage where a transmitted satellite signal is obstructed. The transmission coverage areas, or footprints, of the satellites encompass the forty-eight (48) continuous states, nearby coastal waters and the densely populated regions of Canada. XM has <u>tailored</u> these footprints to provide nearly uniform availability in the United States and to minimize transmission spillage across the United States' borders into Mexico. The satellites are monitored by telemetry, tracking and control stations and are controlled by a space craft control station. (Plaintiffs' Statement of Material Facts ¶8(a) (citation omitted) (emphasis in original)).

During installation of some software, one of the satellites spun out of control, causing it to face into space rather than toward earth, disrupting service. The XM engineers and scientists took a day to right the satellite. The affected satellite was one of two satellites that broadcast the primary XM signal. As a result of one satellite's facing the wrong way, a percentage, but not all, of XM subscribers were without service.

As opposed to terrestrial, or FM and AM radio, which is freely available to anyone, XM service is available to pre-paying subscribers only. Individuals may purchase a subscription to XM in various ways, such as by ordering on-line, at retail locations, over the phone, or by signing up with XM at the time of purchase of a new vehicle. Generally, subscribers pre-authorize a credit card payment each month. Non-commercial subscribers pay a basic monthly subscription fee of $12.95.[2] Defendants claim that the relationship between XM and all subscribers is governed by a Customer Service Agreement ("CSA"). Plaintiffs dispute this, and the record is not clear whether XM subscribers have signed, or even seen, the CSA.

---

[2] Other rates are also available for commercial customers and for customers with more than one point of reception.

The named plaintiffs are three New Jersey residents who were pre-paid XM subscribers during the service interruption. Paul Von Nessi and Lainie Geary certify that they "experienced a signal outage" on May 21-22, 2007, while Jeffrey Mershkin does not address the issue. The plaintiffs aver that they never agreed to or received a signed CSA and that a subscriber is not required to acknowledge reading or accepting the terms of the CSA prior to accepting XM services. The CSA is available for review on XM's website.

At the time of the interruption, XM quickly responded. It apologized to its subscribers affected by the disruption, and it offered a $1 credit. This is the equivalent of more than two days of the pro rata monthly cost of service. To obtain the credit, subscribers were required to call a toll-free number and confirm that they experienced a service interruption. The credit remains available today, and the notification is currently posted on XM's website.[3] At the time, XM advertised the refund in national newspapers and also on its website. None of the three named plaintiffs has requested the credit. In fact, only about 800 subscribers have taken advantage of the offer.

Within XM's CSA there is a provision concerning service interruptions. In a nearly identical class action law suit, *Taylor v. XM Satellite Radio, Inc.*, 533 F. Supp. 2d 1151 (N.D. Ala. 2007), Judge Bowdre concluded that "All subscribers to XM's services execute a Customer Agreement . . . ." 533 F. Supp. 2d at 1152. Plaintiffs distinguish this case by contesting this one issue which underpins Judge Bowdre's decision. As noted above, Plaintiffs declare that they never read, acknowledged, or signed a CSA.

Plaintiffs argue in the complaint alternatively that (a) there was a breach of the CSA; (b) no contract exists between the parties because the plaintiffs never received, acknowledged, or signed

---

[3] http://www.xmradio.com/service_degradation/index.xmc (last visited Sept. 22, 2008).

the CSA; and (c) the CSA is a contract of adhesion that cannot be enforced. Under each of these theories, Plaintiffs seek return of the pro rata monthly cost of the service related to the interruption. In addition to the above claims, Plaintiffs contend that XM retained an unjust enrichment in violation of the quasi-contractual duty it owed to it subscribers. The requested relief is damages, restitution via injunctive relief, and a declaratory judgment compelling XM to disgorge its unjust enrichment. Additionally, Plaintiffs seek a declaratory judgment that (1) Plaintiffs' relationship with XM is not governed by the CSA, (2) Plaintiffs are exempt from arbitrating this matter, as required by the CSA, and (3) Defendants must compensate Plaintiffs for their injuries. Each claim is addressed below.

Defendants move for summary judgment to dismiss Plaintiffs' claims in their entirety. Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson*, 477 U.S. at 255).

I.     Plaintiffs' Contractual Claims

   *A.     Breach of contract*

Although Plaintiffs argue throughout their submissions that the CSA is invalid and does not govern subscribers' relationship with XM, in Count I, Plaintiffs contend that due to the service interruption, XM "breached its non-commercial and commercial subscription contracts with its subscribers . . . ." (First Amended Complaint ("FAC"), Count I ¶ 14). The Court disagrees. There is no obligation in the CSA requiring XM to provide perfect service, *i.e.*, continuous, uninterrupted service as the Plaintiffs contend.[4]  In fact, the CSA limits XM's liability.  The Court relies on *Taylor*, which is based on the same facts and the same CSA.  In *Taylor*, the Court held that the CSA "undisputedly" governed the parties' relationship and that the CSA "does not obligate XM to provide continuous uninterrupted service and, in fact, expressly and unambiguously disclaims such service." 533 F. Supp. 2d at 1156 n.4.

This Court agrees.  The CSA unambiguously disclaims any promise of continuous, uninterrupted service.  For example, in Section 3, the CSA provides, "Radio Service may be unavailable or interrupted from time to time for a variety of reasons . . . . [XM is] not responsible for any noise and/or interruptions of Radio Service."[5]  Further, in Section 10(a), the CSA specifies, in all capital letters, "You understand and agree that the services are provided 'as is' and 'as

---

   [4]     Plaintiffs frame the issue as "[w]hether [XM] . . . fail[ed] to provide continuous [satellite radio service and/or signals] on May 21, 2007 and/or May 22, 2007."  (FAC, ¶ 8(e)).

   [5]     Plaintiffs argue that the limitation of liability provision only applies to topographical and environmental disruptions such as where service is interrupted when entering a tunnel. There is little support for this argument in the CSA, which uses far broader language to disclaim XM's liability.  This Court is not determining whether XM can disavow responsibility for all interruptions of service.  The Court limits its ruling to a single disruption that is presented here.

available'.  [XM] make[s] no warranty or representation, either express or implied, regarding the services and/or your XM radio or other equipment." The rationale of *Taylor* is adopted here.

It is noteworthy that a Pennsylvania court made a similar ruling with regard to cable television service.  In *Kaplan v. Cablevision of Pa., Inc.*, 671 A. 2d 716, 721 (Pa. Super. Ct. 1996), the court held that a limitation of liability provision within the service agreement of Cablevision, a cable television provider, barred recovery for a service disruption.  In short, a single episode of service interruption lasting about 24 hours does not give rise to a cause of action for breach of the CSA.

### B. *Contract of adhesion*

Next, Plaintiffs argue that the CSA constitutes a contract of adhesion which is therefore voidable. Despite Plaintiffs' protestations, a contract of adhesion is not always voidable. Generally, courts strive to enforce arms length contracts and will only strike down a contract by virtue of this theory on rare occasions where extraordinary facts exist. For example, in *Discover Bank v. Shea*, 827 A.2d 358, 366 (N.J. Super. Ct. Law Div. 2001), the court found that an arbitration clause between parties of unequal bargaining power that precluded class actions and consolidations and benefitted only the credit card company at the expense of individual cardholders was unconscionable and unenforceable.  In order to find a contract voidable, a court must analyze the parties' bargaining positions, degree of economic compulsion, and the public interests. *Rudbart v. N. Jersey Dist. Water Supply Comm'n*, 605 A.2d 681, 687 (N.J. 1992).   While Plaintiffs did not brief these policy implications, the public policy concerns are obviously not at issue here because satellite radio is not an economic necessity, and the subscribers are not under economic compulsion to purchase XM's services.  In fact, the plaintiffs freely admit that they logged onto XM's website and acquired the

service by promising payment through an automatic monthly charge on their credit cards. Plaintiffs allege no no strong arm or deceptive tactics.[6]

### C.  *The absence of a contract*

Lastly, Plaintiffs argue that there is no contract between the parties because Plaintiffs never received, acknowledged, or executed a CSA, and therefore, Plaintiffs are not bound by the terms of the CSA.  The CSA is available on XM's website for review by all subscribers and available to purchasers of new vehicles equipped with XM in written form as it is provided along with the warranties, etc., at the time of purchase.  Although there is case law in this Circuit that availability of a service agreement on-line may be sufficient to enforce its terms,[7] the Court accepts Plaintiffs' representation  as true for purposes of this motion.

In this matter there must be "some form of agreement" between XM and its subscribers. *See Schwartz*, 256 Fed Appx. at 519.  After all, there were services provided in consideration of a monthly fee.  As such, the dispute is limited to what are the terms of the form of agreement, and more specifically, whether there is an obligation by XM to provide continuous, uninterrupted service all the time.

When a contract has not been integrated into a writing, what the parties meant or envisioned depends on what the parties might have reasonably comprehended at the time of the making of the

---

[6]    None of the courts that have addressed similar service disruptions have found that the relationships of the parties created an unenforceable contract of adhesion.  *See, e.g.*, *Schwartz v. Comcast*, 256 Fed. Appx. 515 (3d Cir. 2007); *Taylor*, 533 F. Supp. 2d at 1151; *Kaplan*, 671 A. 2d 716.

[7]    *See Schwartz*, 256 Fed. Appx. at 520 (wherein the court stated that "the terms of the contract were available to [the plaintiff] via the website, and thus they are binding, despite the fact that he was unaware of them").

contract. *Gordon v. Stevens Inst. of Tech.*, 106 A.2d 15, 17 (N.J. Super. Ct. App. Div. 1954). This requires the court to look at the surrounding circumstances and course of dealing between the parties. *Westinghouse Elec. Co. v. Murphy, Inc.*, 228 A.2d 656, 659 (Pa. 1967).

Under this standard, Plaintiffs' expectation of perfect uninterrupted service at all times is unrealistic. In this age of electronic and telecommunication advances, consumers are all too familiar with service disruptions in cable television, cell phone, and internet services. In this case, where cutting edge communication and space science intersect, a single episode of disrupted service is clearly foreseeable. Where the disruption is immediately addressed and is coupled with a credit offer, that is about all the parties could reasonably expect. *See Slater v. Pearle Vision Center, Inc.*, 546 A.2d 676, 679 (Pa. Super. 1988) ("In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made . . . ." (citation omitted)).

II.     Unjust Enrichment

In Count II, Plaintiffs claim that due to the service interruption, Defendants breached their quasi-contractual duty to provide radio transmission and service to Plaintiffs and that Defendants were unjustly enriched by retaining economic benefits, such as the subscription fees paid by Plaintiffs. The application of this principle is questionable because a plaintiff can only pursue a quasi-contractual claim in the absence of a valid express contract. *Suburban Transfer Svc., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226-27 (3d Cir. 1983). Assuming unjust enrichment is an available remedy, it does not apply here. A claim under the quasi-contractual theory of unjust enrichment has two essential elements: "(1) that the defendant has received a benefit from the

plaintiff, and (2) that the retention of the benefit by the defendant is inequitable." *Wanaque Borough Sewerage Auth. v. W. Milford*, 677 A.2d 747, 753 (N.J. 1996) (citation omitted). "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994) (citation omitted). *Accord Garden State Equities, Inc. v. Ross*, No. 05-0085, 2006 WL 1128707, at *9 (D.N.J. Mar. 31, 2006).

Plaintiffs satisfy the first element by virtue of payment of service fees. (FAC, Count II ¶ 4). The Plaintiffs cannot satisfy the second element of their claim, because the retention of this benefit by Defendants is not inequitable for two reasons. First, Defendants are not obligated to provide their subscribers with continuous, uninterrupted service; and second, the service interruption which was timely repaired and coupled with a credit offer is a *de minimis* injury. Each of these reasons on its own demonstrates that Defendants' retention of this benefit was not inequitable.

    *A.     XM is not obligated to provide continuous, uninterrupted service*

Although this issue is discussed previously in the Opinion, the Court finds *Kaplan*, 671 A. 2d at 716, factually on point and instructive. In *Kaplan*, the plaintiff filed a class action on behalf of all cable subscribers against the defendant cable companies alleging that defendants' failure to provide continuous, uninterrupted cable programming and failure to provide credit or notice for how to obtain credit for periods of service interruptions constituted, *inter alia*, a breach of contract and a breach of the implied warranty of merchantability allegedly contained in the subscription agreement. Unlike the matter at hand, in *Kaplan*, the agreement between the subscribers and the cable providers did not address whether the cable providers had an obligation to provide

uninterrupted service. In the instant matter, XM expressly disavowed an obligation to provide continuous service. (*See supra* Section I.A). Additionally, in *Kaplan*, the defendants did not give their subscribers any notice that they could obtain a credit for the service interruption, as XM has. The plaintiff argued that in the absence of an express provision, reason and justice obligated the court to create a duty for defendants to provide uninterrupted service. The court disagreed, holding, "[w]e may not imply the contractual duty to provide continuous uninterrupted service or unrequested credits for outages when it is unclear whether the [defendants] clearly intended to be bound by this obligation." 671 A.2d at 720.

In other factually similar cases, courts have also refused to create a duty for a service provider to maintain uninterrupted service. In *Schwartz*, 256 Fed. Appx. at 515, the Third Circuit found that although language on Comcast's website stated that its high-speed internet service was "always on," Comcast was not obligated to provide continuous, uninterrupted service, even though plaintiff's internet service was interrupted and/or unavailable for ten days. Also, in *Shapiro v. Comcast Corp.*, No. MID-L-2034-02, a New Jersey Superior Court found: "State and federal courts outside of New Jersey have . . . refused to impose an implied duty on cable service providers or manufacturers to provide uninterrupted or error-free service . . . . Accordingly, plaintiff has no right to uninterrupted or error-free use of Comcast . . . ." Transcript of Record at 9:21-10:5 (Oct. 14, 2003).

This Court agrees with the aforementioned cases and will not create an obligation upon XM to provide its customers with perfect service. It is clear that XM did not intend to be bound by this duty, and a reasonable person would not expect there to be such an obligation. *See Ford Motor Co. v. Edgewood Properties, Inc.*, Nos. 06-1278, 06-4266, 2007 WL 4526594, at *12 (D.N.J. Dec. 18, 2007).

The plaintiffs tangentially argue that this case should proceed because subscribers were not given fair notice of the availability of the refund. Plaintiffs contend each subscriber should have been contacted. The Court disagrees. Often in disputes with service providers, it is the subscriber's responsibility to call and request relief. Notably, in New Jersey, by regulation, if a cable television provider has an outage, the provider must give credit if the customer calls and complains. N.J. Admin. Code § 14:18-3.5 (2007). There is no reason for this Court to change customary dealings within the flow of commerce absent compelling facts.

      B.      *The alleged injury is de minimis*

A second independent reason why Plaintiffs' claim of unjust enrichment fails is that the service interruption which is timely repaired and coupled with a refund offer is a *de minimis* injury. Because the alleged injury to subscribers was *de minimis*, the retention of benefits by XM is not inequitable. This Court invokes the doctrine of *de minimis non curat lex*, which translates as "[t]he law does not care for, or take notice of trifling matters." *Skaff v. Meridien North America Beverly Hills, LLC*, 506 F.3d 832, 840 (9th Cir. 2007) (citation omitted). *Accord In re Hammond*, 27 F.3d 52, 57 n.7 (3d Cir. 1994). The doctrine applies "where no damage is implied by law from the wrong, and only trifling or immaterial damage results therefrom." *Paternoster v. Shuster*, 687 A.2d 330, 337-38 (N.J. Super. Ct. App. Div. 1997) (citation omitted). The Supreme Court clarifies, "[t]he venerable maxim *de minimis non curat lex* . . . is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept." *Wis. Dept. of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992).

Courts have invoked *de minimis non curat lex* to dispense with various trifling claims. *See, e.g.*, *Norwood v. Strada*, 249 Fed Appx. 269, 272 (3d Cir. 2007) (holding that serving prisoner food forbidden by his religion for seven consecutive meals was a *de minimis* burden on prisoner's religious beliefs under the Religious Freedom Restoration Act)*; Alan's of Atlanta, Inc. v. Minolta Group*, 903 F.2d 1414, 1421 (11th Cir. 1990) (finding that defendant's potential gain of $350,540 out of $12,891,883 (or three cents on the dollar) resulting from its alleged price discrimination was *de minimis* when compared to the total volume of purchases); *In re Worldcom, Inc.*, 339 B.R. 836, 844 (S.D.N.Y. 2006) (noting that unjust enrichment claims were without merit because the alleged injury was *de minimis* and did not work a true detriment to the unjust enrichment claimant); *Schlichtman v. NJ Highway Auth.*, 579 A.2d 1275, 1280-81 (N.J. Super. Ct. Law Div. 1990) (finding that plaintiff's suing the State for the replacement value of one Garden State Parkway toll token was "vexatious and harassing" and was a suit for *de minimis* injury, reasoning, "[t]he loss that plaintiff will have to bear as a result of the dismissal of this count is one of any number of trifling inconveniences that we all commonly encounter in our daily lives.").

Just as the above courts found, Plaintiffs' alleged injury from the service interruption was *de minimis*. A single episode of disrupted service which was timely repaired and coupled with a refund offer amounts to a trifling claim.

In monetary terms, non-commercial subscribers pay a basic monthly fee of $12.95 per month, subject to potential discounts. By this Court's calculation, for a basic non-commercial subscriber, 24 hours of service in May is equal to 42 cents of service, plus tax. Plaintiffs add to their complaint a panoply of other fees charged by XM, such as activation fees, taxes, late fees, invoice charges, and even interest on moneys owed to Plaintiffs, but these other costs do not add much to the monetary

injury for a 24-hour service interruption. Further, after the service interruption, XM made an immediate offer of compensation, and this offer is still advertised and still available. XM continues to offer a credit of $1.00 to all non-commercial subscribers who merely call up and claim they were affected by the service interruption. The $1.00 offer exceeds the pro rata cost of 2 days, or 48 hours, of missed service and over-compensates non-commercial subscribers for the loss they have incurred.

III.     Declaratory Judgment

In their third and final count, Plaintiffs seek a declaratory judgment that (1) Plaintiffs' relationship with XM is not governed by the CSA, (2) Plaintiffs are exempt from arbitrating this matter, and (3) Defendants must compensate Plaintiffs for their injuries. This Court finds that Plaintiffs' request for a declaratory judgment is moot based on the above rulings. *See Holloway v. MacFarland*, No. 07-2032, 2007 WL 3376683, at *1 (D.N.J. Nov. 13, 2007) (quoting *Int'l Brotherhood of Boilermakers v. Kelly*, 815 F.2d 912, 915 (3d Cir. 1987)). Since the Court has ruled that Plaintiffs cannot recover under any of their equitable or contractual theories, declaratory relief is no longer at issue. *See Armstrong World Industs., Inc. by Wolfson v. Adams*, 961 F.2d 405, 411 (3d Cir. 1992).

IV.     Class Action Considerations

There are several class action considerations that require comment.

First, the plaintiffs state that a class action is superior to other available methods for fair and efficient adjudication of the controversy because the damages suffered are relatively small, and the expense and burden of individual litigation makes it impossible for members of the class to seek redress. The Court recognizes that the policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring

a solo action prosecuting his or her rights. "A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 617 (citation omitted). In many cases the law is complex, and the recovery is small per individual.[8] This policy is not at issue in this case. In the cases cited in footnote eight, it was impractical, and perhaps not even possible, for an individual to sue because the recovery is negligible–a class action was the superior method for resolving individuals' claims. By contrast, in this matter, the class members can be reimbursed by making a single telephone call. It is not burdensome. There is no need to aggregate small recoveries. Hence, the class action is not a superior device in any sense[9].

Finally, this Court is reluctant to open its doors to a new cause of class action every time any service provider like XM experiences a temporary loss in transmission. This is a very slippery slope.

V. Plaintiffs' Motion for Leave to File a Second Amended Class Action Complaint

Finally, Plaintiffs move this Court for leave to file a second amended class action complaint. The only difference between the first and second amended complaints is that the latter adds a claim entitled, "Alter ego; corporate veil; corporate domination." Plaintiffs submit that the purpose of this new claim is to plead more specifically against defendant XM Satellite Radio Holdings, Inc. based

---

[8] *See, e.g.*, *Elias v. Ungar's Food Prods., Inc.*, No. 06-2448, 2008 WL 2704538 (D.N.J. June 30, 2008) (certifying class of consumers, seeking redress for food producer's mislabeling of fat and caloric content); *Smith v. Prof. Billing & Mgmt. Svcs., Inc.*, No. 06-4453, 2007 WL 4191749 (D.N.J. Nov. 21, 2007) (granting motion to settle where relief amounted to $6.50 per class member seeking redress for violation of Fair Debt Collection Practices Act); *Stephenson v. Bell Atl. Corp.*, 177 F.R.D. 279, 289 (D.N.J. 1997) (certifying class where "most of the putative class members allegedly suffered damages in such small amounts [that] it would be economically infeasible for them to proceed individually").

[9] The Court observes, but makes no ruling, that Plaintiff may not meet the $5 million threshold for maintaining a class action (9 million subscribers multiplied by $.42 equals $3.78 million). 28 U.S.C. §1332(d)(2).

upon additional information. This new claim attempts to add information to the pleadings about the relationship between the two defendants, XM Satellite Radio Holdings, Inc. and XM Satellite Radio, Inc., and tries to counter Defendants' argument that Plaintiffs have not alleged any relationship with the parent company that could form the basis for a claim against it.

Although Federal Rule of Civil Procedure 15(a) provides that "leave to amend shall be freely given when justice so requires," such a motion may be denied for several reasons, including "futility of the amendment." *Riley v. Taylor*, 62 F.3d 86, 90 (3d Cir. 1995) (citing *Foman v. Davis*, 371 U.S. 178, 181-82 (1962)). All relief requested in Plaintiffs' new alter ego claim, Plaintiffs have already requested in their original three claims. Having dismissed these original claims, this Court finds Plaintiffs' new alter ego claim futile, as a request for inquiry into the relationship between the two defendants would not "breathe life" into Plaintiffs' case. *See Lorenz v. CSX Corp.*, 1 F.3d 1406, 1414 (3d Cir. 1993).

For these reasons, Defendants' motion for summary judgment is granted, and Plaintiffs' first amended class action complaint is dismissed with prejudice. Additionally, Plaintiffs' motion for leave to file a second amended class action complaint is denied. An appropriate order shall issue.

  *s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

September 26, 2008